NOTICE
Decision filed 05/27/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 251064-U

NOS. 5-25-1064, 5-25-1065, 5-25-1066 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

| | | |
|---|---|---|
| *In re* RYLAND S., KYZER S., and RAYLEE P., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 23-JA-246, |
| v. | ) | 25-JA-34, 25-JA-35 |
| | ) | |
| Brittany P., | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| Respondent-Appellant.) | ) | Judge, presiding. |

---

JUSTICE CLARKE delivered the judgment of the court.
Justices McHaney and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's judgment terminating Mother's parental rights was not against the manifest weight of the evidence where the State met its burden of proving that she was unfit to parent and that termination was in the best interests of the minors. Therefore, the judgment of the circuit court is affirmed.

¶ 2    The respondent, Brittany P. (Mother), appeals from the December 29, 2025, order of the Macon County circuit court terminating her parental rights over her three minor children. On appeal, Mother challenges both the finding of unfitness and the determination that it was in the minors' best interests to terminate her parental rights. For the reasons explained below, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4                    A. Adjudication of Neglect and Initial Proceedings

¶ 5    This matter involves three minors, who were originally the subjects of proceedings under the Juvenile Court Act in Douglas and Macon Counties. In February 2023 Raylee P. and Kyzer S. were adjudicated to be neglected minors due to an environment injurious to their welfare and were made wards of the court in Douglas County. Mother was named as the minors' mother. The State alleged that Raylee was neglected because (1) Mother was unable to care for her due to being hospitalized while giving birth to Kyzer, (2) Raylee's father had been indicated by the Illinois Department of Children and Family Services (DCFS) for abuse to a child, and (3) Mother's father was living with the minor after being indicated by DCFS for sexual abuse of a child. The State alleged that Kyzer was neglected because (1) both he and Mother tested positive for methamphetamine at his birth, (2) Kyzer's father (a different individual than Raylee's father) was incarcerated on felony charges related to methamphetamine, and (3) DCFS had already taken protective custody of Raylee due to allegations of inadequate supervision.

¶ 6    After Mother gave birth to her third child, Ryland S., in December 2023 the State filed a petition regarding him in Macon County, and the circuit court adjudicated the minor as neglected and made him a ward of the court in January 2024. The State alleged that Ryland was neglected and abused because, at the time of his birth, Mother had two other children in care, arrived at the hospital smelling strongly of alcohol, and tested positive for methamphetamine. The State further alleged that Ryland tested positive for methamphetamine. The Macon County circuit court found that the State's allegations were proven by a preponderance of the evidence.

¶ 7    Webster-Cantrell Youth Advocacy (WCYA) filed a dispositional report with the Douglas County circuit court regarding Raylee and Kyzer on March 29, 2023. It stated that Mother had

2

been recommended to complete parenting classes, mental health services, and substance abuse services. The report further stated that Mother had "significant delays" in her parenting classes, as she had missed several sessions and was at risk of being dropped from the program. She had been dropped from substance abuse services due to her failure to regularly attend, and had cancelled two meetings with her caseworker that were scheduled to address her inconsistency in services. Mother had been sent for drug testing on 12 occasions, and only attended twice.

¶ 8 Regarding visitation, the report stated that there were significant delays getting visits started due to agency understaffing. Once visits commenced, Mother did well, but regularly had to be redirected and often tried to take the children to unsupervised parts of the building. Due to issues with one of the minors, a foster parent was allowed to supervise Mother's visits. Approximately one month into these visits, the foster parent informed WCYA that she was no longer willing to supervise, due to arguments with Mother. The foster parent also reported that she believed Mother was under the influence during a visit. Mother was also regularly argumentative with WCYA workers during visitation and missed several visits.

¶ 9 WCYA filed a report in the Douglas County cases in September 2023 stating that Mother was now engaging in parenting classes and had completed a portion of the curriculum. She was assessed to be a medium-level risk in "several categories" relating to parenting. Her participation in substance abuse services continued to be poor, and she tested positive for methamphetamines, amphetamines, and ecstasy/MDMA on three occasions despite denying any illegal drug use. She had not yet engaged in mental health services. Mother cited transportation as a barrier to accessing mental health and substance abuse services, despite being referred to a program that could assist her with transportation. The agency was also concerned because Mother appeared to be pregnant

3

for the past few months, but only admitted to it on September 26, 2023. DCFS had received a report that Mother had admitted to using drugs while pregnant.[1]

¶ 10    Mother's visitation continued to be supervised. WCYA reported "considerable" issues with Mother missing visits, which twice resulted in the temporary suspension of her visitation. One minor would scream and become inconsolable during several visits, and the other would spend the full two hours not interacting with Mother at all.

¶ 11    The circuit court entered permanency orders in the Douglas County cases on October 11, 2023. It repeated its findings that Mother had made neither reasonable efforts nor reasonable and sustainable progress toward the return of the minors.

¶ 12    WCYA filed a permanency report with the Macon County circuit court in Ryland's case on January 25, 2024, identifying the same services. This report stated that Mother was participating in parenting classes. She was scheduled to complete mental health and substance abuse assessments, but did not complete them for several months. After starting substance abuse services, she was eventually unsuccessfully discharged due to nonattendance. Mother reported to her caseworker that she was attending Narcotics Anonymous meetings, and provided a handwritten letter with no name or other contact information as alleged proof. Mother had failed to complete a "significant number" of drug tests, always citing transportation as a major barrier. The report stated that agency staff offered to help her learn the bus system—and even to ride the bus with her—so that she could get to her appointments, but she was resistant to all attempts to help. Mother completed four drug tests, all while pregnant with Ryland. All were positive for methamphetamine, amphetamines, and MDMA.

---

[1]This refers to the pregnancy after which Mother gave birth to Ryland. As the State alleged in the case concerning this minor, both the minor and Mother tested positive for drugs at his birth.

¶ 13    Regarding visitation, Mother had attended 4 out of 10 visits as of the date of the report, and she had a poor record of confirming visits in advance, as was required of her. Her caseworker received "missed reports" regarding Mother's performance at visitation with Ryland. There were various issues during two of the visits, while the other two went well.

¶ 14    In a report filed in the Douglas County cases in March 2024 WCYA wrote that Mother had been successfully discharged from parenting classes. However, several agency staff members continued to observe numerous concerning behaviors during visitation. The primary issue was that Mother seemed to rely on the eldest minor, Raylee, to act in almost a caregiver role toward Kyzer and the new baby, Ryland, during visits. Mother frequently appeared overwhelmed during visits, and did not adequately supervise the minors, including during an outing to the mall. Out of 44 visits over the past six months, Mother attended 16. Mother had attended "a few sessions" of substance abuse treatment and still failed to appear for several drug tests. A drug test in November 2023 was positive for methamphetamine and amphetamines, and one in March 2024 was positive for those substances and MDMA. Mother continued to blame her failure to engage in substance abuse services on transportation issues, and continued to refuse transportation assistance.

¶ 15    On April 10, 2024, the Douglas County circuit court entered a permanency order setting a permanency goal of return home within 12 months, and finding that Mother had made neither reasonable efforts nor reasonable and substantial progress toward the return of Raylee and Kyzer.

¶ 16    WYCA filed a report in the Macon County case in July 2024 writing that Mother had successfully completed parenting classes, but was unsatisfactory in substance abuse services. She voluntarily checked herself into rehab on January 28, 2024, but left three hours after arriving. She told the agency that she would complete outpatient treatment instead, but after attending one group therapy session on February 12, 2024, she never returned. She checked herself into rehab again on

5

June 28, 2024, but checked out on July 1, 2024, stating that she was not getting anything out of this treatment. She had not returned to any substance abuse services since. Mother had been scheduled for six "field" drug tests (as opposed to tests that took place when Mother was at the WCYA offices) in the last review period, and failed to appear for all. Agency staff came to her after she missed the latest one and had her complete the test. However, the results were not available at the time of the report. During the same period, Mother had also been tested at the agency's offices four times. Three tests were positive for methamphetamine, amphetamines, benzodiazepine, and MDMA.

¶ 17 Mother failed to attend 13 out of 28 visits with Ryland during the latest six-month review period. Mother had significant issues following the rules for confirming visits. Her caseworker also received numerous "troubling reports" about her behavior, including her difficulty focusing on all three children and her leaving visits early because she was tired. She also failed to bring enough supplies for all three children on several occasions, and the agency had to provide formula for Ryland because Mother did not bring any for him. Several agency staff members noted that Mother appeared to be under the influence during her visits.

¶ 18 In September 2024 WCYA submitted a report in the Douglas County cases stating that Mother continued to be inconsistent with her services. She had been scheduled for six field drug tests during the last review period, and only completed one.[2] Mother had asked to have her drug tests scheduled for days that she was already at the agency offices, citing the transportation barrier. However, the agency was concerned that Mother requested this accommodation so that she could only attend office visits, and therefore drug testing, when she was sober.

---

[2]It is unclear throughout these reports whether and to what extent the drug tests mentioned overlap between the two Douglas County cases and the Macon County case.

¶ 19 Due to her frequent missed visitation, Mother was required to confirm in advance that she would be attending visits, and to arrive at the agency an hour before each visit. During the last review period, she missed 11 out of 23 visits. Of those 11, 9 were due to Mother's failure to confirm or failure to show up an hour early. She was also reported to be "extremely defiant" with the agency about these rules. She also frequently arrived 20 to 30 minutes late.

¶ 20 On December 5, 2024, the State filed motions seeking a finding of unfitness and termination of parental rights against Mother in both Douglas County cases.[3] The State alleged that Mother was an unfit parent under the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)) due to (1) a failure to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of Raylee and Kyzer (*id.* § 1(D)(b)); (2) a failure to make reasonable efforts to correct the conditions that were the basis for the minors' removal during the nine-month periods from February 15, 2023, through November 15, 2023, and from November 15, 2023, through August 15, 2024 (*id.* § 1(D)(m)(i)); and (3) a failure to make reasonable progress toward the return of the minors during the same two nine-month periods following the adjudication of neglect (*id.* § 1(D)(m)(ii)). On the same date, the Douglas County circuit court entered a permanency order changing the permanency goal to substitute care pending court determination of parental rights, and finding that Mother had made neither reasonable efforts nor reasonable and substantial progress toward the return of the minors.

¶ 21 WCYA filed a report in Ryland's case in Macon County in January 2025. It stated that Mother remained unsatisfactory on substance abuse services, and failed to attend any drug tests during the past six months. According to her treatment provider, their last contact with Mother was

---

[3]These motions, as well as the motion and termination proceedings regarding the minor Ryland, also named the respective minors' fathers. However, as neither is a party to this appeal, we discuss the cases only as they pertain to Mother, and mention the fathers only where relevant.

on October 8, 2024. Mother had recently asked WCYA for a referral to their own counseling services, but those services were on hold due to a staffing shortage. Mother's visitation remained "sporadic at best"—out of 23 visits in the past six months, she missed 14, and continued to have difficulty complying with the rules for confirming visits.

¶ 22    On February 7, 2025, the State filed a motion seeking a finding of unfitness and termination of parental rights in the Macon County case regarding Ryland. The bases for the State's allegations of unfitness against Mother were the same as those raised in the Douglas County cases, with two distinctions. Regarding reasonable efforts, the State did not specify a nine-month period following the adjudication of neglect. Regarding reasonable progress, the State alleged nine-month periods of January 3, 2024, through October 3, 2024, and May 6, 2024, through February 6, 2025. The Douglas County cases were transferred to Macon County on February 11, 2025, and the three minors' cases involving Mother proceeded together from that point onward.

¶ 23                    B. Fitness Hearing

¶ 24    The circuit court of Macon County, now presiding over all three minors' cases, held a fitness hearing on November 14, 2025. WCYA case manager Sierra Kerby testified for the State. She explained that she had been the caseworker assigned to the three minors' cases since June 13, 2025, and had reviewed the previous caseworker's reports. She testified that Mother's service plan included parenting, substance abuse, and mental health services. Kerby stated that Mother's initial engagement with parenting classes was inconsistent over 2022 and early 2023, but she had successfully completed parenting services by March 6, 2024.

¶ 25    Mother completed a behavioral health assessment on May 13, 2022, and was recommended for counseling. She was required to complete an updated assessment in October 2022 due to her failure to engage in the recommended treatment, which she completed. However, she was later

8

unsuccessfully discharged from mental health services in January 2023 due to her lack of participation. Kerby did not know whether another mental health referral was made for Mother following her discharge, but testified that she was referred to WCYA for counseling in the fall of 2024. After coming off the waitlist at WCYA, Mother engaged in counseling "for a bit," before her unsuccessful discharge in May 2024 due to lack of engagement.

¶ 26 Kerby testified that substance abuse was one of the main reasons for the minors' being brought into care, and Mother did not display any meaningful engagement with substance abuse services until May of 2025. According to the previous caseworker's September 2023 report, Mother was drug-tested at the agency's offices three times in the spring and summer of that year, each time coinciding with Mother coming for visitation. Mother tested positive for methamphetamine and MDMA each time. Mother was also regularly sent for field drug tests, but had only attended twice, in January and November 2023. The January test came back negative.[4] Kerby further testified that after briefly entering rehab from June 28 to July 1, 2024, Mother stopped communicating with her substance abuse counselor until October 8, 2024. The prior caseworker's January 2025 report indicated that no further confirmed instances of Mother contacting substance abuse services.

¶ 27 Mother checked back into rehab in May 2025 and completed the 28-day inpatient program in June. During this time, Mother's drug screening was paused, but Kerby began scheduling her for tests upon her completing the program. Kerby testified that throughout her time as Mother's caseworker, Mother had not attended a single drug test. Over the course of the case, Mother had been sent for 43 field drug tests.

---

[4]Kerby did not mention the results of the November 2023 test.

¶ 28    Next, Kerby testified that Mother had been offered a total of 146 visits with the minors since the case opened. She missed 65 and attended 80.[5] Between April and October of 2024, Mother was offered 23 visits with Raylee and Kyzer and attended 12. Between July 2024 and January 2025 she attended 9 out of 23 visits in Ryland's case. Kerby also testified about the behavioral concerns that Mother's visitation supervisors had raised, as noted in the prior caseworker's reports. She stated that these issues included Mother's inconsistencies in bringing sufficient supplies for the children, and the way that she treated Raylee, relying on her to help watch her younger siblings. Mother was currently being offered visitation once per month, and had attended her last two visits.

¶ 29    Mother completed a "nurturing parenting" program in 2023 and a "living protective factors" parenting program in March 2024. However, the concerns about Mother's behavior at visitation continued past those dates, and still existed at present. Kerby stated that while a parent would normally be referred to more parenting courses if issues persisted, she did not make any such referrals for Mother when she took over as caseworker. This was because the permanency goal had been changed to substitute care by that time, and the agency did not make parenting referrals in such cases.

¶ 30    On cross examination, Kerby stated that she had limited contact with Mother. She also had no documentation from the previous caseworker regarding any discussions with Mother about the issues observed during her visitation. However, in Kerby's understanding, Mother's behavior would have been addressed during her parenting courses and in child and family team meetings (CFTM). However, Kerby testified that she did not receive any communication from the parenting

---

[5]The mistake in math comes from Kerby's testimony, and it is unclear whether the single unaccounted-for visit was missed or attended.

program, as Mother had completed those services before Kerby's time on the case. Kerby also did not attend CFTMs.

¶ 31    Regarding Mother's parenting issues, Kerby stated that her failure to bring sufficient supplies happened "a few times," and not recently. She also testified that she did not know whether the previous caseworker had spoken with Mother about her drug testing attendance. When Kerby started on the case, Mother told her she was living out of town and could not come to the tests. While there were no testing locations near where Mother was living, Kerby stated that Mother was given bus tokens and offered assistance in learning the bus system, but she did not take advantage of this. However, Kerby was not certain that Mother lived near a bus stop. Kerby further testified that Mother was also referred to an agency that could send someone to her for testing and transport her sample for analysis, but she never used this service.

¶ 32    Kerby was also asked how soon she believed the minors could be returned to Mother, if Mother immediately started engaging in all services. She opined that it would be "not soon," specifying that it would take more than six months. Kerby further wondered whether it might be beneficial to have Mother repeat parenting classes, despite her having completed her parenting services requirement.

¶ 33    Following Kerby's testimony, the circuit court heard testimony from one of the minor's fathers. Mother did not testify. After hearing arguments, the circuit court delivered its findings. It found Kerby to be a credible witness. It noted that the two older minors were brought into care in August 2022 due to inadequate supervision and Mother's substance abuse, and these continued to be issues throughout the case. The court recognized that Mother completed parenting services in March of 2024 and found that this was "the only thing" she did.

11

¶ 34  She was dropped from counseling due to a lack of engagement in January 2023 and tried to restart mental health services in the fall of 2024. She was then again discharged for lack of engagement in May of 2025. The court further noted that Mother was attending substance abuse services in 2023, but was not submitting herself for drug testing. When she did appear for testing, she was positive for methamphetamine, amphetamines, and/or MDMA on at least three occasions. The court further recognized that Mother did go to rehab for 28 days in May and June of 2025, but that this was after the time periods the court was reviewing for parental fitness. Furthermore, Mother had not attended any drug tests since leaving rehab.

¶ 35  Regarding visitation, the circuit court found that Mother's visits were sporadic. The court calculated that she only attended 44% of visits. Therefore, the court concluded that for all those reasons, the State had shown by clear and convincing evidence that Mother was an unfit parent. Addressing the State's motions in each minor's case, the court declined to find that Mother failed to make reasonable efforts, but found that she had (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare and (2) failed to make reasonable progress toward the return of the minors. For the latter basis, the circuit court's finding regarding Raylee and Kyzer covered the nine-month periods from February 15, 2023, through November 15, 2023, and from November 15, 2023, through August 15, 2024. Regarding Ryland, the relevant nine-month periods were from January 3, 2024, through October 3, 2024, and from May 6, 2024, through February 6, 2025. The court set the matter for a hearing on best interest.

¶ 36                                    C. Best Interest Hearing

¶ 37  On December 18, 2025, in advance of the hearing, WCYA filed a best interest report prepared by caseworker Sierra Kerby. The report addressed each statutory best interest factor for all three minors. The report stated that eight-year-old Raylee was placed with her paternal

12

grandparents, where she had lived since August 2022. Her grandparents were both available and willing to provide for her needs, were financially able to care for her, and were committed to providing her with permanency through adoption. Placement with her biological family meant that Raylee's background, culture and religion remained consistent. She also had monthly visits with her brothers, Kyzer and Ryland.

¶ 38 Kerby had conducted monthly home visits and described the home as spacious, safe, and nurturing. Raylee had her own room in the home, and all her physical and emotional needs were being met. The minor was up-to-date on medical care, and there were no concerns about her well-being. She showed no signs of emotional distress and appeared happy and thriving. Her grandparents were doing a "tremendous job" supporting her in growing her identity. She participated in community events and was doing well in school, where she had many friends.

¶ 39 Raylee was bonded and strongly attached to her grandparents, and she identified them as her parental figures. Raylee expressed to Kerby that she did not want to live with Mother and wished to stay with her grandparents. While she had only limited contact with her biological father throughout her life, she loved him, and her grandparents were willing to nurture her relationship with him as long as he was a safe person for her to be around.

¶ 40 Next, the report stated that three-year-old Kyzer and two-year-old Ryland were placed in a licensed foster home in August 2022 and December 2023 respectively. Both foster parents were willing and able to provide for the minors' needs, to provide them with permanency, and to adopt the minors. Kerby conducted monthly home visits, and she made similar comments regarding the two minors' living situation as she had about Raylee's. The boys were also similarly up-to-date on all medical care, they were supported in developing their identities, and there were no concerns

13

about their well-being. The foster family and the minors were involved in their community, and the minors enjoyed attending daycare.

¶ 41    While Kyzer and Ryland were too young to voice their wishes, the report indicated that they identified their foster parents as their mother and father, they had adapted to the home, and they were strongly bonded with their foster family. The foster parents also maintained a relationship with Raylee's paternal grandparents, and the siblings saw each other monthly. The report further stated that the boys' foster parents had "gone above and beyond" to provide a safe and loving home environment and to make the minors feel included in the family. The report concluded with the recommendations that Mother's parental rights be terminated, and that the permanency goal should be changed to adoption for all three minors.

¶ 42    The best interest hearing took place on December 29, 2025. The circuit court heard further testimony from Sierra Kerby. She testified to the contents of the WCYA best interest report that she had prepared, stating that all three minors were loved, supported, and well cared for in their respective foster placements, had all of their needs met by their foster families, and were thriving and healthy. The minors had various interests and activities in which they participated. Kyzer and Ryland had both required corrective surgical procedures, and their foster parents followed the doctor's instructions; both boys had healed well and were medically up-to-date. The two sets of foster parents had recently exchanged information in order to facilitate visits between the siblings beyond those provided for by WCYA.

¶ 43    Kerby also confirmed that she had spoken with Raylee, who told her that while she loved Mother, she wished to stay with her grandparents. Kerby further testified that Kyzer and Ryland's foster family also included the parents' older foster daughter, and the boys got along very well with her. The foster home had passed safety checks. Kerby also noted that this home was the only

14

home the boys had ever known—both were removed from Mother's care at or shortly after their births and placed with the same foster family—so they were very attached to the family. Both foster families were willing to provide the minors permanency through adoption, and Kerby opined that it was in the minors' best interests that Mother's parental rights be terminated and that the minors achieve permanency through adoption.

¶ 44    On cross examination, Kerby testified that she had had informal conversations with Raylee's foster parents about whether they would facilitate contact between Raylee and Mother. Kerby stated that Raylee's paternal grandmother was not open to this at present, but "[t]hat could change in the future." Kerby had a similar conversation with the boys' foster mother, who also stated that she was not open to it at the moment, but that she would be if the boys asked about Mother when they were older. Kerby was also asked about the remaining barriers to the minors being returned to Mother. She stated that her visitation was sporadic and her substance abuse could not be monitored due to her failures to appear for drug testing. Apart from the two mentioned, Kerby said were no other outstanding services or issues.

¶ 45    No other witnesses testified. Following arguments, the circuit court began by stating that it had reviewed WCYA's report, which specifically addressed the statutory best interest factors. Regarding Raylee, the circuit court noted that she was placed with her paternal grandparents and indicated that she wished to continue living with them. She was bonded to them, and was doing well in school and in her current placement. Kyzer and Ryland had never known any home apart from their foster home, and they showed strong attachments to their foster family. They were doing well there, and their medical needs were being met. For those reasons, the circuit court found that it was in the best interest of the minors that Mother's parental rights be terminated. The circuit

15

court entered an order terminating Mother's parental rights as to the three minors. Mother filed a timely notice of appeal. The three cases were consolidated on appeal.

¶ 46                                   II. ANALYSIS

¶ 47     On appeal, Mother argues that the circuit court's findings that she was an unfit parent and that termination of her parental rights was in the minors' best interests were against the manifest weight of the evidence.

¶ 48                    A. The Circuit Court's Finding of Unfitness

¶ 49     A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act of 1987 (Juvenile Court Act) and the Adoption Act. *Id.* Pursuant to the Juvenile Court Act, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act. *Id.*; 705 ILCS 405/2-29(2) (West 2024); 750 ILCS 50/1(D) (West 2024). If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024).

¶ 50     Here, the circuit court based its unfit-person ruling on a lack of reasonable interest, concern, or responsibility (750 ILCS 50/1(D)(b) (West 2024)) and a lack of reasonable progress (*id*. § 1(D)(m)(ii)). Section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed unfit. However, only one properly proven ground is sufficient to enter a finding of unfitness. See *id*. § 1(D) (stating that the grounds of unfitness "are any one or more" of

16

an enumerated list); see also *In re C.W.*, 199 Ill. 2d 198, 210 (2002). We begin our review with the failure to make reasonable progress, and find that the circuit court properly found Mother unfit on this ground. Therefore, we need not address its finding of a lack of reasonable interest, concern, or responsibility, pursuant to section 1(D)(b) of the Adoption Act. 750 ILCS 50/1(D)(b) (West 2024).

¶ 51   As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
> * * *
> (m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." *Id*. § 1(D)(m)(ii).

¶ 52   Under the Adoption Act, "reasonable progress" is determined by an objective standard, which is based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. The Adoption Act provides guidance for measuring reasonable progress as follows:

> "If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan ***." 750 ILCS 50/1(D)(m)(ii) (West 2024).

Under section 1(D)(m) of the Adoption Act, the benchmark for measuring reasonable progress "encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 Ill. 2d 181, 208 (2001)).

¶ 53   In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings

17

are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The lower court's finding of unfitness is afforded great deference because that court was best positioned to view and evaluate the parties and their testimony. *Id.* Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 54 On appeal, Mother challenges the circuit court's unfitness finding under subsection D(m)(ii) by arguing that she completed a mental health assessment, attended substance abuse treatment, and completed her first parenting course during the first relevant nine-month period in Raylee and Kyzer's cases, from February 15, 2023 through November 15, 2023. During the second period, from November 15, 2023, through August 15, 2024, she notes that she attended rehab in January 2024 and completed her second parenting course in March 2024. She was also waitlisted for mental health counseling, and thus argues that she was unable to progress in that area.

¶ 55 Lastly, Mother argues that she completed all referrals and assessments, attended a month of rehab, and completed the aforementioned second parenting course during the time periods covering 2024 and 2025. She admits that she could have completed more of her services and had better attendance at drug testing, but contends that "her situation made it difficult." She states that Kerby did not know whether the missed drug tests were discussed with Mother, admitted that the bus system did not service her area, and did not know whether Mother was participating in drug testing through the facility that provided her substance abuse treatment.

¶ 56 By Mother's own admission, she failed to complete two-thirds of her service plan across all four relevant time periods. The Adoption Act states that a failure to make reasonable progress includes the failure to substantially fulfill service plan requirements. 750 ILCS 50/1(D)(m)(ii)

18

(West 2024). The circuit court recognized that Mother completed her parenting courses. However, the court also heard testimony that her visitation supervisors were concerned about her behavior while parenting her children during visits and these concerns extended past Mother's completion of parenting services, to the point that Kerby opined that Mother would benefit from retaking classes.

¶ 57    Additionally, during the first nine-month period applicable to Kyzer and Raylee, Mother had not completed *any* services. This period ran from February 15, 2023, through November 15, 2023, and ended approximately one year and three months since the start of the case. In that time, Mother was unsuccessfully discharged from substance abuse services, missed the majority of her field drug tests, and did not engage in mental health services. Even if she struggled with transportation to the drug testing location, despite the assistance that Kerby explained was offered to her, the court measures reasonable progress under an objective standard.

¶ 58    Mother also tested positive for various illicit substances on three separate occasions when she was tested at the WYCA offices during this first period, and she admitted to using methamphetamine and alcohol during the first six months of her pregnancy with Ryland. Lastly, her visitation was suspended and reinstated twice, due to her infrequent attendance. She was also required to confirm visits and arrive early, for the same reason.

¶ 59    During the period from November 15, 2023, through August 15, 2024, Mother continued to miss the majority of her drug tests, and continued to test positive on tests administered at the agency offices. She gave birth to Ryland during this time, and both Mother and the minor tested positive for methamphetamine, causing Ryland to be removed from her care. She also entered rehab twice during this period, and left shortly after checking herself in on both occasions. She eventually completed a 28-day stay in rehab, but this was after all of the relevant nine-month

19

periods in which the court measured her progress. There was also no evidence that she made reasonable progress on mental health services during this second period.

¶ 60    The two periods pertaining to Ryland ran from January 3, 2024, through October 3, 2024, and from May 6, 2024, through February 6, 2025. To the extent that the former period overlaps with the time that the circuit court considered regarding the two older minors, we repeat our abovementioned analysis here. Mother was discharged from mental health services in May 2025 for failing to engage, and her last contact with her substance abuse counselor was in October 2024. Mother also continued her pattern of failing to appear for field drug tests.

¶ 61    Throughout the entire case, she was sent to 43 such tests, and only attended twice. There was no evidence that she was not aware of her drug testing requirements. When she did undergo testing, she was positive for various substances, including while pregnant. She could not demonstrate her sobriety due to her sparse engagement in substance abuse services. This was particularly concerning given that her substance abuse was a major factor in the removal of all three minors. Inadequate supervision was also an issue, and Mother was noted to be struggling with observing all of her children during visitation, and even relied on Raylee to assist her.

¶ 62    Kerby testified that it would take more than six months of consistent engagement with services for Mother to reach a point where the minors could be returned to her care. See *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (progress is reasonable when the court can conclude that the compliance "with directives given for the return of the minor is sufficiently demonstrable and of such a quality" that the minor may be returned to her "in the near future"). Thus, for all these reasons, we find that the circuit court's finding of unfitness on the basis of a lack of reasonable progress was not against the manifest weight of the evidence.

20

¶ 63                    B. The Circuit Court's Best-Interest Finding

¶ 64    Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental

rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should*

be terminated." (Emphasis in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest

in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving

home life." *Id.* At this stage of the termination hearing, the State bears the burden of proving by a

preponderance of the evidence that termination of parental rights is in the child's best interest.

*In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 65    In making a best-interest determination, the court must consider several factors, within the

context of the child's age and developmental needs. 705 ILCS 405/1-3(4.05) (West 2024). The

factors are as follows:

> " '(1) the child's physical safety and welfare; (2) the development of the child's
> identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the
> child's sense of attachments, including love, security, familiarity, continuity of affection,
> and the least disruptive placement alternative; (5) the child's wishes and long-term goals;
> (6) the child's community ties; (7) the child's need for permanence, including the need for
> stability and continuity of relationships with parent figures and siblings; (8) the uniqueness
> of every family and child; (9) the risks related to substitute care; and (10) the preferences
> of the person available to care for the child.' " *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32
> (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)).

¶ 66    As with the circuit court's findings at the unfitness stage, we afford the court great

deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh

conflicting evidence. *Id.* ¶ 33. We will not reverse the circuit court's best-interest determination

unless it is against the manifest weight of the evidence. *Id.*

¶ 67    On appeal, Mother argues that the circuit court's ruling was against the manifest weight of

the evidence because the balance of statutory best interest factors did not favor termination of her

parental rights. She admits that the following factors did favor termination: (1) the safety and

21

welfare of the children, (2) the children's attachments and the least disruptive placement, (3) the child's preferences (as applicable to Raylee), (4) the children's community ties, and (5) the risks attendant to substitute care. Mother does not argue that the factor of the preferences of persons available to care for the children falls in favor of either outcome, as she states that both she and the foster parents wish to care for the minors.

¶ 68    Of the remaining four factors, she contends that both (1) the development of the minors' identities and (2) the minors' backgrounds and ties favor her because Kerby testified that the siblings only saw each other for four hours per month, and that Raylee loves Mother. Therefore, Mother states that termination would deprive the minors of ties to their mother and her side of their family. Regarding the minors' need for permanence, Mother argues that this favors her because there was only brief testimony given about the foster families' abilities to provide permanence, whereas Mother showed throughout the course of the case that she was "clearly willing" to do so.

¶ 69    Lastly, Mother argues that the factor of the uniqueness of every family was not addressed by the circuit court, but that it should fall in her favor because Mother never had the opportunity to parent her children, the children did not have the opportunity to know their mother, and both sets of foster parents did not support the children having a relationship with Mother. Overall, she argues that the State presented sparse testimony on best interest, and therefore, there was not enough evidence to support its position.

¶ 70    We disagree with Mother that the State presented insufficient evidence to support the circuit court's best interest finding. Kerby prepared a best interest report and testified to the information provided within it at the hearing. Her knowledge was based on monthly visits that she conducted at both foster families' homes. Kerby stated that all three minors were thriving, happy, and healthy in their placements, and had love, safety, and permanence with their respective foster

22

families. They were bonded to their respective foster parents, and were integrated into their communities. Both sets of foster parents were committed to providing permanence through adoption.

¶ 71    Mother acknowledges that Raylee expressed a desire to remain with her foster parents and not return to Mother, and that Kyzer and Ryland have spent their whole lives with their foster family. See *In re Tiffany M.*, 353 Ill. App. 3d 883, 893 (2004) (The court may "consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being."). Raylee was placed with her biological grandparents, and the boys were placed together and were able to see their sister on a regular basis. Contrary to Mother's position that the siblings had very limited contact with one another, the record shows that their foster parents had exchanged contact information so that they could arrange additional visits in the future.

¶ 72    Mother also admits that half of the statutory factors favor termination. We agree with the circuit court's determination that the actual balance in support of termination is even greater. We further find that Mother's argument that the evidence was insufficient to properly weigh the relevant factors is not borne out by the record. In addition to hearing Kerby's testimony, the circuit court stated that it had reviewed the WYCA best interest report, and noted that the report addressed each factor. The court was not required to explain its reasoning for each factor in rendering its decision. *Id.* Additionally, there was no evidence contradicting or challenging the State's assertions at the best interest hearing. In conclusion, we find that the circuit court's best interest determination, as well as its decision to terminate Mother's parental rights over the three minors, was not against the manifest weight of the evidence.

¶ 73                                III. CONCLUSION

¶ 74    For the reasons stated, the circuit court did not err in terminating Mother's parental rights.

The judgment of the circuit court is affirmed.


¶ 75    Affirmed.